# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**ANTHONY LAMAR**                                                                                **PLAINTIFF**
**ADC #120479**

**v.**                                                      **Case No. 4:21-CV-00529-LPR**

**JOE PROFIRI, in his official capacity**
**as Secretary of the Arkansas Department of**
**Corrections, et al.**                                                                        **DEFENDANTS**

## ORDER

Plaintiff Anthony Lamar is an inmate in the Arkansas Department of Corrections (ADC).

Defendants are ADC prison officials.[1]   Mr. Lamar alleges that, pursuant to ADC policy,

Defendants confiscated nearly all of the funds in Mr. Lamar's inmate account and used those funds

to pay off various debts owed by Mr. Lamar to the ADC.   Mr. Lamar claims that both the ADC

policy and Defendants' manner of enforcing that policy violated his constitutional rights.

Defendants have moved to dismiss all of Mr. Lamar's claims.[2]   The Court GRANTS that Motion.

## BACKGROUND[3]

Like many Americans, Mr. Lamar received at least one COVID-19 stimulus check.

Specifically, "[i]n late-March 2021, Mr. Lamar received a $1,400" check from the federal

---

[1] Mr. Lamar named ADC Secretary Solomon Graves, Division of Correction Director Dexter Payne, and Varner Unit Business Manager Barbara Smallwood as Defendants.  Second Am. Compl. (Doc. 51) ¶¶ 2–4.  Each Defendant was named in his or her official and individual capacities.  *Id.* ¶ 5.  Since the filing of the operative Complaint, Joe Profiri has replaced Solomon Graves as ADC Secretary.  Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Profiri replaces Mr. Graves with respect to the official-capacity claims initially launched against Mr. Graves.

[2] Defs.' Mot. to Dismiss Pl.'s Second Am. Compl. (Doc. 53).

[3] These background facts are taken from the Second Amended Complaint and considered true for purposes of this Order.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  This case has traveled an unusual procedural path and already undergone several milestones.  *See Hayes v. Graves*, Doc. 79, Case No. 4:21-cv-00347 (E.D. Ark. Sept. 3, 2021) (granting preliminary injunction) [hereinafter *Hayes Master Docket*]; *Hayes Master Docket* (Doc. 422) (granting summary judgment and entering statewide injunction).  But Mr. Lamar has filed a Second Amended Complaint, so only the facts alleged and claims raised in that operative Complaint matter now.

government.[4]   Unlike most Americans, however, Mr. Lamar received his stimulus check while incarcerated.[5]   With this unique setting came unique problems.   In an Arkansas state prison, it is tough for an inmate to keep his money.   And it wasn't the other inmates that worried Mr. Lamar— it was the prison officials.[6]

The ADC has instituted a policy that allows prison officials "to confiscate all but $5 from an [inmate's] account to pay off certain liens" owed by that inmate.[7]   Mr. Lamar was aware of this policy, called Administrative Directive (AD) 16-44, when he received his stimulus check.[8]   Mr. Lamar was also aware that he had various charges credited against his inmate account.[9]   He wanted to avoid depositing his stimulus funds into that account because doing so would mean being forced to pay those charges.[10]   His plan?   Mail the stimulus check to his mother, who held his power of attorney, so that the check could be cashed outside the purview of the ADC.[11]   But ADC Business Manager Barbara Smallwood quickly put an end to that idea, telling Mr. Lamar that "he was not allowed to mail the unsigned [stimulus] check to his mother."[12]   His plan thwarted, Mr. Lamar deposited the check into his inmate account.[13]

---

[4] Second Am. Compl. (Doc. 51) ¶ 8.

[5] *Id.*

[6] *Id.* ¶ 9.

[7] *Id.* ¶ 16.

[8] *See id.* ¶¶ 9, 11, 16.

[9] *See id.* ¶ 11.

[10] *Id.* ¶¶ 9, 11.

[11] *Id.* ¶ 10.

[12] *Id.*

[13] *Id.* ¶¶ 12–13.   Mr. Lamar also alleges that Ms. Smallwood assured him that his stimulus funds would "not be used" "to satisfy certain charges against his account."   *Id.* ¶ 11.   It seems that, other than making Ms. Smallwood look bad, this allegation doesn't play any role in relation to any of Mr. Lamar's claims.   Ms. Smallwood's actions are relevant only to Mr. Lamar's claim that she violated the First Amendment by refusing to let him send the check to his mother. *See id.* ¶¶ 17–25.   And even if she lied to Mr. Lamar, that wouldn't further the First Amendment claim because the nature of the alleged lie doesn't make it plausible to conclude that she was motivated by a desire to suppress

Mr. Lamar's fears immediately materialized. "Within seven seconds, the ADC withdrew $1,395" to pay the following of Mr. Lamar's debts: (1) "$280.20 for various federal filing fees"; (2) "$217.07 for a medical copay charge"; (3) "$755.56 as restitution for state property"; (4) "$3.00 for an ID card replacement"; and (5) "$139.17 for postage charges."[14]  According to Mr. Lamar, these charges all represented debts to the ADC, so "[t]he ADC simply refunded itself . . . ."[15]  Mr. Lamar brought this suit to get his stimulus funds back and prevent the ADC from performing similar confiscations in the future.

## DISCUSSION

Mr. Lamar's operative Complaint raises four constitutional claims. First, he alleges that Ms. Smallwood violated the First Amendment when she prevented him from mailing the stimulus check to his mother. Second, he claims that AD 16-44 and Defendants' enforcement thereof violates the Fourteenth Amendment because it effects a deprivation of liberty and property without due process of law. Third, he says the confiscation of his stimulus funds violated his rights under the doctrine of substantive due process. Fourth, he contends that the confiscation was an unconstitutional taking without just compensation. As set forth below, none of these claims survives Defendants' Motion to Dismiss.

## I.      First Amendment Claim

The First Amendment prohibits "law[s] . . . abridging the freedom of speech . . . ."[16]  As an initial matter, it's highly questionable whether the operative Complaint even alleges that Mr. Lamar engaged in, or attempted to engage in, speech. To be sure, access to the mail often

---

constitutionally protected expression.  *See infra* pp. 3–5; *see also Sisney v. Kaemingk*, 15 F.4th 1181, 1190 (8th Cir. 2021).

[14] Second Am. Compl. (Doc. 51) ¶ 14.

[15] *Id.* ¶ 15.

[16] U.S. Const. amend. I.

implicates the First Amendment.  But dropping an envelope into a mailbox is not in and of itself

constitutionally significant.  It is the ability to express or receive ideas or information (for which

the mail is a common medium) that brings the First Amendment into play.[17]  And there is no actual

allegation that Mr. Lamar tried to engage in any such expression.  By his own version of the story,

he wanted to mail the check to his mother so that he wouldn't have to pay his debts to the ADC.

At most, the operative Complaint could be read as implicitly alleging that Mr. Lamar partially

intended his mailing of the check to be expressive conduct communicating his disagreement with

AD 16-44 as a policy.[18]  Even with the benefit of this generous assumption, Mr. Lamar's claim

fails.

Prison officials enjoy significant latitude when it comes to regulating the speech of inmates.

Accordingly, an inmate bringing a First Amendment claim against a prison official carries a heavy

burden.  Mr. Lamar must plausibly allege that Ms. Smallwood's decision to prevent him from

mailing the stimulus check to his mother was not "reasonably related to legitimate penological

interests."[19]  The Supreme Court has articulated four factors to aid lower courts in this analysis:

> [W]hether the regulation has a valid, rational connection to a legitimate
> governmental interest; whether alternative means are open to inmates to exercise
> the asserted right; what impact an accommodation of the right would have on
> guards and inmates and prison resources; and whether there are ready alternatives
> to the regulation.[20]

---

[17] *See Redlich v. City of St. Louis*, 51 F.4th 283, 287 (8th Cir. 2022) ("In addition to protecting the spoken or written word, conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." (cleaned up)).

[18] *But see id.* ("A person's intent to express an idea through conduct cannot alone bring that conduct within the First Amendment's protection of speech.  Instead, the Supreme Court has extended First Amendment protection only to conduct that is inherently expressive." (cleaned up)).

[19] *Turner v. Safley*, 482 U.S. 78, 89 (1987).

[20] *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (internal quotation marks and citation omitted).

The first factor—the existence of a rational connection to a legitimate governmental interest—"operates as a threshold condition that the regulation must satisfy to pass constitutional muster."[21]   There can be no doubt that a state agency collecting on a debt is a legitimate governmental interest.  And Ms. Smallwood's decision to prohibit Mr. Lamar from mailing away his stimulus check was a valid, rational way of advancing that interest.  Mr. Lamar's only contrary argument is that collection of owed funds pursuant to AD 16-44 fails even this extremely deferential level of review because AD 16-44 "is not lawful."[22]   But, as explained later in this Order, Mr. Lamar has not successfully stated a claim that AD 16-44 is unconstitutional.

With the opening hurdle cleared, "the court must determine the regulation's constitutionality by balancing the remaining three factors."[23]   Each one cuts against Mr. Lamar. Nothing in the operative Complaint plausibly alleges the absence of "alternative means . . . to exercise the asserted right . . . ."[24]   That is, the operative Complaint leaves open other ways for Mr. Lamar to have communicated his disagreement with AD 16-44 as a policy—e.g., writing a letter, using a telephone, or conversing during in-person visitation.  And accommodating Mr. Lamar's preferred form of expression would have had a not-insignificant impact on prison resources because it would have prevented the ADC from collecting the $1,395 that Mr. Lamar owed to the ADC.  Finally, there's nothing to plausibly allege that Ms. Smallwood had ready alternatives that she could have used instead of preventing Mr. Lamar from mailing the check to his mother. Indeed, the whole point of Mr. Lamar's alleged plan was that the ADC wouldn't be able to get his

---

[21] *Sisney*, 15 F.4th at 1190.

[22] Pl.'s Opp'n to Defs.' Mot. to Dismiss (Doc. 40) at 15.  Mr. Lamar incorporates this particular brief by reference in his opposition to Defendants' pending Motion to Dismiss the Second Amended Complaint.  Pl.'s Opp'n to Defs.' Mot. to Dismiss (Doc. 56) ¶ 8.

[23] *Sisney*, 15 F.4th at 1190.

[24] *Overton*, 539 U.S. at 132 (citing *Turner*, 482 U.S. at 89–91).

money if he sent the check to his mother.  So even under Mr. Lamar's version of the story, stopping him from mailing the check was Ms. Smallwood's only viable option.

## II.    Procedural Due Process Claim

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ."[25]  Mr. Lamar complains that he was deprived of both a liberty interest (the First Amendment right to send mail) and a property interest (money) without due process.  Mr. Lamar's procedural due process claim premised on the inability to mail his stimulus check is easily resolved.  As discussed above, there was no violation of the First Amendment.  That means there was no deprivation of Mr. Lamar's First Amendment rights for which process was necessary.

Mr. Lamar alleges that Defendants violated his procedural due process rights because they did not "give him adequate notice and opportunity to be heard" before or after they confiscated his stimulus funds.[26]  Mr. Lamar has conceded that, under Eighth Circuit precedent, pre-deprivation process is not necessary in these circumstances so long as there was sufficient post-deprivation process.[27]  And with respect to the available post-deprivation process (e.g., the ADC's grievance procedures), the operative Complaint contains only one allegation: The ADC's grievance policy "states that issues 'controlled by . . . Federal law' are nongrievable," which means that Mr. Lamar cannot raise "any of the constitutional challenge[s] raised in [the operative] complaint" in an ADC grievance proceeding.[28]

---

[25] U.S. Const. amend. XIV.

[26] Second Am. Compl. (Doc. 51) ¶¶ 30–31.

[27] *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss (Doc. 40) at 4 n.1; *see also supra* note 22.

[28] Second Am. Compl. (Doc. 51) ¶ 31 (ellipsis in original).

Mr. Lamar is mistaken to assert that procedural due process requires giving him the ability to challenge the constitutionality of the underlying confiscations.  Such an argument fails to recognize the narrow, albeit extremely important, role of a procedural due process claim: avoiding "the mistaken or unjustified deprivation of life, liberty, or property" by giving the person suffering that deprivation some opportunity to contest the government's basis for the deprivation.[29]  The operative Complaint does not allege that the ADC's grievance procedures foreclose Mr. Lamar from challenging the factual basis underlying the ADC's decision to confiscate his money—i.e., whether he actually owed the fines the ADC believed him to owe.  Nor does the operative Complaint allege that, if Mr. Lamar successfully pursued such a grievance, the ADC still would not return his confiscated funds.  In the absence of such allegations, there is no plausibly alleged basis from which to conclude that Mr. Lamar has not been afforded constitutionally sufficient post-deprivation process.[30]

Mr. Lamar's theory of liability may stem from a misreading of one of this Court's rulings in a prior iteration of this same case.  At that time, the Court was adjudicating procedural due process claims arising from the confiscation of inmates' COVID-19 stimulus funds pursuant to Arkansas Act 1110 of 2021.[31]  The Court ultimately concluded that procedural due process required a meaningful opportunity (either before or soon after the deprivation) to challenge the confiscation as violative of federal law.[32]  But that conclusion was specific to Act 1110, which explicitly required that all confiscations conducted pursuant to that statute comply with federal

---

[29] *Carey v. Piphus*, 435 U.S. 247, 259 (1978).

[30] It would be difficult, if not impossible, to make such allegations in light of this Court's prior Orders in this case recognizing that the ADC interprets its own grievance policies as authorizing the reimbursement of funds erroneously confiscated.  *See Hayes Master Docket* (Doc. 79) at 18–19.

[31] *Hayes Master Docket* (Doc. 79) at 1–4, 13–19; *Hayes Master Docket* (Doc. 422) at 10–11.

[32] *Hayes Master Docket* (Doc. 79) at 14–15, 18–19; *Hayes Master Docket* (Doc. 422) at 10–11.

law. So compliance with federal law actually operated as a factual predicate that had to be satisfied; otherwise, the deprivation would have been mistaken or unjustified under the law supposedly authorizing the deprivation.[33] But this Court did not hold that procedural due process itself requires state agencies to entertain constitutional challenges to the statutes or policies that authorize their actions.

## III.    Substantive Due Process Claim and Takings Claim

Mr. Lamar's substantive due process claim and takings claim merit little discussion, as this Court has already rejected nearly identical claims in previous phases of this case. Confiscating an inmate's money and using the money to pay that inmate's debts to a state agency reasonably advances a legitimate government interest, does not violate a fundamental right of the inmate, and does not shock the conscience. Accordingly, such a confiscation passes constitutional muster under any potentially applicable substantive due process framework.[34] And using an inmate's money to pay that inmate's debts is just compensation because it provides the inmate with a dollar-for-dollar benefit. Thus, no unconstitutional taking occurs from such a confiscation.[35]

## IV.    No Available Relief

Even if Mr. Lamar had plausibly alleged one or more constitutional violations, this case would still be dismissed. That's because the Court cannot grant Mr. Lamar any of the relief sought in the operative Complaint.

Mr. Lamar wants his $1,395 back. Generally, a federal court cannot order a state or state agency to pay a plaintiff money damages.[36] Similarly, a federal court cannot order a state official

---

[33] *See Hayes Master Docket* (Doc. 79) at 14–15, 18–19; *Hayes Master Docket* (Doc. 422) at 10–11.

[34] *See Hayes Master Docket* (Doc. 79) at 20–21; *Hayes Master Docket* (Doc. 422) at 11–16.

[35] *See Hayes Master Docket* (Doc. 79) at 22–23; *Hayes Master Docket* (Doc. 422) at 9–10.

[36] *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).

to pay money damages unless the state official violated a "clearly established" constitutional rule.[37]

Mr. Lamar tries to plead around these immunities by asking for "equitable restitution."[38]  This

Court has acknowledged the important distinction between money damages and equitable

restitution: Money damages involve a state, state agency, or state official paying money out-of-

pocket in order to make up for past illegal conduct; equitable restitution, on the other hand, is the

return of the exact property that was wrongfully confiscated.[39]  This Court has also noted, however,

that the window of opportunity for equitable restitution shuts the moment the confiscated funds

become part of the state treasury.[40]  Mr. Lamar alleges that the ADC "refunded itself" by depositing

Mr. Lamar's confiscated funds "into the ADC's accounts . . . ."[41]  So this is not a situation where

the ADC has placed Mr. Lamar's money in some separate account before placing them in a state

account or otherwise disbursing them.[42]  Accordingly, this Court would have no authority to order

the ADC to repay Mr. Lamar.  Likewise, even if Mr. Lamar had managed to state a viable claim,

none of Defendants' alleged actions would rise to the level of violating a "clearly established"

constitutional rule under the Supreme Court's and Eighth Circuit's notoriously strict qualified-

immunity precedents.

Mr. Lamar also requests an injunction preventing ADC officials from continuing to enforce

AD 16-44.  Again, the operative Complaint is insufficient to entitle Mr. Lamar to such relief.  In

order to ask for an injunction prohibiting enforcement of AD 16-44, Mr. Lamar must plausibly

---

[37] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

[38] Second Am. Compl. (Doc. 51) ¶¶ 25, 32, 39, 44 & p. 6.

[39] *See Hayes Master Docket* (Doc. 79) at 25–27.

[40] *See id.*

[41] Second Am. Compl. (Doc. 51) ¶ 15.

[42] *Cf. Hayes Master Docket* (Doc. 79) at 25–27.

allege that he is "likely to suffer [a] future injury from" Defendants' enforcement of AD 16-44.[43]

There are no allegations, however, that Mr. Lamar will have money deposited into his inmate account and then confiscated pursuant to AD 16-44 in the future.  Indeed, Mr. Lamar acknowledges in his briefing that receiving money is rare.[44]  Moreover, his allegations indicate that he avoids placing money in the account on the rare occasions that he does come into money.

## CONCLUSION

For the reasons given above, Defendants' Motion to Dismiss is GRANTED.  All claims raised in the Second Amended Complaint will be dismissed without prejudice, and this case will be closed.

IT IS SO ORDERED this 2nd day of June 2023.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[43] *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

[44] *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss (Doc. 40) at 15 ("It is likely that inmates receive few checks while in jail."); *see also supra* note 22.